THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: December 30, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

——

Trademark Trial and Appeal Board

——

*In re Kent Pedersen*

——

Serial No. 85328868

——

Mark J. Masterson and Sandra M. Koenig for Kent Pedersen.


Kathleen M. Vanston, Trademark Examining Attorney, Law Office 107 (J. Leslie Bishop, Managing Attorney).

——

Before Kuhlke, Shaw and Kuczma, Administrative Trademark Judges.

Opinion by Kuczma, Administrative Trademark Judge:

Kent Pedersen ("applicant"), appeals from the final refusal to register the following mark in standard character format:

LAKOTA

for the following goods:

> Medicinal herbal remedies, namely echinacea; amino acid supplements for nutritional purposes; medicinal herbal preparations for the treatment of hair, skin and nails; medicinal herbal preparations for the treatment of pain; medicinal herbal preparations for the treatment of muscle and joint pain; medicinal herbal preparations for the treatment of arthritis; medicinal herbal preparations for

> the treatment of joint cartilage degeneration; medicinal herbal preparations for the treatment of prostate malfunction; medicinal herbal preparations for the treatment of colds; medicinal herbal preparations for the lubrication of joints; medicinal herbal preparations for the prevention of flu; medicinal herbal preparations for the treatment of pain in animals; liniments; vitamin supplements; medicinal herbal preparations for the treatment of diabetic related pain; medicinal herbal preparations for the treatment of neuropathic related pain; topical analgesics; mineral supplements in Class 5.[1]

The examining attorney issued a final refusal to register the mark pursuant to Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), because the applied-for mark consists of or includes matter which may falsely suggest a connection with the Native American Lakota people.

After the refusal was made final, applicant appealed and filed a request for reconsideration which was denied. Applicant and the examining attorney have filed briefs. For the reasons set forth below, the refusal to register is affirmed.

Evidentiary Issues

Applicant submitted Exhibits Y and Z with its appeal brief. These Exhibits, which were not previously submitted, consist of copies of the court docket sheet for the lawsuit entitled *Oglala Lakota Delegation of the Black Hills Sioux Nation Treaty Council et al.* v. *United States of America et al.*, Civil Action No. CV-09-8196-PCT-FJM, filed in the District Court for the District of Arizona, and the March 24, 2010 Order entered in that case. Generally, materials not previously made of record during prosecution of an application are untimely if submitted for the first

---

[1] Application Serial No. 85328868 filed May 24, 2011, by Kent Pedersen, a Canadian citizen, under Sections 1(b) and 44(e) of the Trademark Act, 15 U.S.C. §§ 1051(b) and 1126(e), based on Canadian Trademark Registration No. TMA643,850 issued July 7, 2005.

time at briefing and will not ordinarily be considered by the Board. *See* Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d), and TBMP § 1203.02(e) (3d ed. rev.2 2013).

Nor does this untimely evidence fall under an exception by which we would treat the evidence as being of record, e.g., if the examining attorney (1) did not object to the new evidence, and (2) discussed it or otherwise affirmatively treated it as being of record. *See* TBMP § 1207.03. Although the examining attorney did not object to the late-filed evidence, she did not discuss it or otherwise treat it as being of record. Additionally, inasmuch as the examining attorney submitted evidence pertaining to the lawsuit with the June 11, 2012 final Office Action, applicant had the opportunity to submit such evidence with its Request for Reconsideration. Accordingly, Exhibits Y and Z attached to applicant's Appeal Brief are untimely and have not been considered in arriving at our decision.

<u>False Suggestion of a Connection</u>

The issue presented in this appeal is whether applicant's LAKOTA mark for medicinal herbal remedies falsely suggests a connection with a particular group of Native American people within the meaning of § 2(a) of the Trademark Act, 15 U.S.C. § 1052(a).

Section 2(a) prohibits the registration of a mark that consists of or comprises matter that may falsely suggest a connection with persons, institutions, beliefs, or national symbols. To establish that a proposed mark falsely suggests a connection with a person or an institution, it is the examining attorney's burden to show:

> (1) the mark is the same as, or a close approximation of, the name or identity previously used by another person or institution;

(2) the mark would be recognized as such, in that it points uniquely and unmistakably to that person or institution;

(3) the person or institution named by the mark is not connected with the activities performed by the applicant under the mark; and

(4) the fame or reputation of the person or institution is such that, when the mark is used with the applicant's goods or services, a connection with the person or institution would be presumed.

*In re Jackson Int'l Trading Co.*, 103 USPQ2d 1417, 1419 (TTAB 2012); *Buffett* v. *Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985); *In re Cotter & Co.*, 228 USPQ 202, 204 (TTAB 1985); *see also Univ. of Notre Dame du Lac* v. *J.C. Gourmet Food Imports Co.*, 703 F.2d 1372, 1375-77, 217 USPQ 505, 509 (Fed. Cir. 1983) (providing foundational principles for the current four-part test used by the Board to determine the existence of a false connection).

A.     Whether LAKOTA is the same as or a close approximation of the name or <u>identity previously used by another person or institution</u>

Turning to the first factor, we look to the meaning of the term LAKOTA and then determine whether, according to that meaning, the term LAKOTA identifies a person or institution.

(1)     The meaning of LAKOTA

The examining attorney contends that LAKOTA identifies Native American peoples who are part of the Native Americans collectively recognized by the United States government as the Sioux Indian tribe. In support of this meaning, the examining attorney submitted dictionary definitions reflecting that LAKOTA identifies the members of a certain group of Native Americans:

4

- *n.* a member of the large western branch of Sioux people which was made up of several groups that lived on the plains.
  *http://www.vocabulary.com/definition/Lakota*[2]

- *noun.* 1: a member of a western division of the Dakota peoples;
  2: a dialect of Dakota
  *http://www.merriam-webster.com/dictionary/lakota*[3]

- *noun.* 1. *pl.* Lakotas, Lakota a member of the westernmost branch of the Dakotas; 2. The group of dialects of Dakota spoken by the Lakotas
  *http://www.yourdictionary.com/lakota*[4]

Applicant's evidence such as *Wikipedia's* "List of Languages by Name," also recognizes LAKOTA as a language.[5] Applicant contends that his evidence, as well as that submitted by the examining attorney, shows LAKOTA is subject to multiple interpretations that primarily identify a language.[6] Applicant thus argues because LAKOTA is primarily a dialect or language, the term on its face cannot point uniquely and unmistakably to a person or institution. Moreover, even if the other

---

[2] See Attachment No. 1 to November 21, 2011 Office Action.

[3] See Attachment No. 1 to June 11, 2012 Final Office Action.

[4] See Attachment No. 4 to June 11, 2012 Final Office Action.

[5] See page 8 of 18 of the partial "List of languages by Name" from *http://en.wikipedia.org/wiki/List_of_languages_by_name* attached as Exhibit A to May 21, 2012 Response to Office Action. Applicant represents that the Exhibit A attached to its brief "was previously made of record as Exhibit A to the Response to Office Action dated May 21, 2011 [*sic*]." Appeal Brief p. 6. However, the copy of Exhibit A attached to applicant's Appeal Brief bears a more recent print date than the Exhibit A submitted with the May 21, 2012 Response to Office Action. The Board discourages attaching previously filed exhibits to an appeal brief because it is duplicative and requires review to determine whether it is the same as the previously filed exhibit. In this instance, the document is not the same, as it bears a different print date, indicating that it is, at a minimum, an updated version of Exhibit A submitted during prosecution. In view thereof, the document attached to the brief was not previously of record and is untimely. Because the examining attorney did not rely on or address this particular document we have not considered it. We have, of course, considered the Exhibit A attached to applicant's Response.

[6] Applicant Appeal Brief pp. 6-7.

definitions[7] are taken into account, according to applicant, it is not appropriate to pick which definition should be followed as the term cannot possibly point "uniquely and unmistakably" to a person or institution when the evidence clearly shows that the term is subject to multiple definitions, which we construe to mean the term has multiple meanings, some of which do not identify a person or institution but something else, such as a language.[8]

Inasmuch as dictionary definitions can be enough to demonstrate that an applied-for mark identifies a particular person or institution, the examining attorney has more than carried the initial burden of showing that LAKOTA is the same as or a close approximation of the name or identity previously used by another. *In re White*, 80 USPQ2d 1654, 1658 (TTAB 2006) (hereafter "*White II*"); *Cotter*, 228 USPQ at 204-05 (relying on dictionary definitions to find that despite having more than one meaning, the term WEST POINT has "come to be closely associated with and points uniquely to the United States Military Academy"). The fact that the term LAKOTA identifies both a particular group of people and the language spoken by some of the members of the group, is not evidence that LAKOTA fails to identify the Lakota people. *See White II*, 80 USPQ2d at 1659 (MOHAWK found to point uniquely and unmistakably to the Mohawk tribe even though the term identifies both the people and the language spoken by the tribe).

---

[7] The other definitions referenced by applicant during prosecution appear to be connected to the Lakota people or language.

[8] Applicant Appeal Brief pp. 6-7, 15.

Based on the foregoing, we reject applicant's argument that because the term LAKOTA identifies a language, it does not approximate the name or identity of a people or institution.

Additional evidence submitted by the examining attorney providing a historical overview of the transitions of the Lakota people from the early 1800's to the present establishes their identity as "Lakota." In 1825, the United States adopted the name "Sioux" to officially recognize a confederacy of tribes having similar languages, including the Lakota people. A subgroup of the people identified by the United States as the Sioux Nation, specifically, the western Sioux, referred to themselves then and now as Lakota.[9]

The Lakota people are part of the confederation of tribes that speak three different dialects: Lakota, Dakota and Nakota. The Lakota are the largest and most western of the three groups, occupying lands in both North and South Dakota.[10] Around the middle of the eighteenth century, the Lakotas migrated west in pursuit of buffalo when European fur traders began to decimate the eastern

---

[9] Page 934, *Tiller's Guide to INDIAN COUNTRY, Economic Profiles of American Indian Reservations* edited and compiled by Veronica E. Velarde Tiller, BowArrow Publishing Company, Albuquerque, NM; © 2005 by Veronica E. Velarde Tiller (hereafter "*Tiller's Guide*"), Attachment No. 7 to November 21, 2011 Office Action. The people of the Sioux Nation refer to themselves as Lakota, Nakota or Dakota; the word Sioux is not actually part of the Lakota vocabulary. *Id*.

[10] See *http://crystalinks.com/sioux.html* and *http://www.lifeinitiativesinc.org/lakota.html*, Attachment Nos. 5 and 41-42, respectively, to June 11, 2012 Final Office Action. The seven subtribes of the Lakota are the Oglala, Sicangu or Brule, Hunkpapa, Miniconjou, Sihasapa or Blackfeet, Itazipacola (a/k/a Sans Arc) and Ouhenopa. *Id*.

buffalo herds. The Lakotas began to actively resist immigration when settlers began arriving in large numbers, sometime during the mid-1800's.[11]

Red Cloud, a Lakota leader, was so successful in his military campaigns against the United States that they led to the Treaty of Fort Laramie between the United States and the Lakota Nation in 1868, guaranteeing the Lakota specific sections of land in and adjacent to the Dakotas.[12]

In 1876, at the Battle of the Little Bighorn, the Lakota, led by Chief and Medicine Man Sitting Bull and by Crazy Horse, a warrior committed to preserving the Lakota way of life, joined with the Arapaho and Cheyenne nations to defeat General George Armstrong Custer and the Seventh U.S. Calvary who had been protecting the miners in the Black Hills of South Dakota. Because General Custer and nearly all of his troops perished there, this battle is known as "Custer's Last Stand." This legendary event led to a resumption of the Plains Wars and the dispersal of many Lakotas to Canada. In 1889, the Pine Ridge Reservation and Rosebud Reservation were established by an Act of Congress as a home for the Oglala Lakota Sioux and the Sicangu Lakota Oyate, respectively.[13] By the end of 1890, after the killing of Sitting Bull at Standing Rock and the Massacre at Wounded Knee at Pine Ridge, the Sioux, as the federal government officially

---

[11] *Tiller's Guide* p. 937, Attachment No. 10 to November 21, 2011 Office Action.

[12] See *Tiller's Guide* pp. 931 and 937, Attachment Nos. 4 and 10 to November 21, 2011 Office Action and *http://www.crystalinks.com/sioux.html*, Attachment Nos. 8-10 to June 11, 2012 Final Office Action.

[13] *Tiller's Guide* pp. 931 and 934, Attachment Nos. 4 and 7 to November 21, 2011 Office Action.

referred to the various tribes, had been relocated to the reservations recognized by the federal government today.[14]

The majority of Lakota Indians currently reside on one of five federally recognized Indian reservations situated in the Dakotas, namely the Pine Ridge Reservation, Rosebud Reservation, Standing Rock Reservation, Cheyenne River Reservation and the Lower Brule Reservation.[15]

Reservation names determined by the United States government often reflected the geography of the region where the reservation was located and not necessarily the name of the tribe inhabiting those areas. *See In Re White*, 73 USPQ2d 1713, 1719 (TTAB 2004) (hereafter "*White I*") ("the geographic terms in many of the tribes' names . . . may not be as integral to the identity or persona of each tribe, when these terms may merely reflect locations the tribes were relocated to by government action, rather than choice"). For example, the Pine Ridge Reservation, established by an Act of Congress in 1889 as a home for the Oglala Lakota, is so named because the reservation is transected with ridges dotted with spotted pine. The Rosebud Reservation, home to the Sicangu Lakota Oyate, is so named due to the abundance of wild rosebuds that grew in the vicinity. The Standing Rock Reservation of the Hunkpapa and Blackfeet subtribes of the Lakota

---

[14] *Tiller's Guide* p. 937, Attachment No. 10 to November 21, 2011 Office Action and *http://cyrstalinks.com/sioux.html*, Attachment Nos. 5-7 to June 11, 2012 Final Office Action.

[15] *See http://www.indians.org/articles/lakota-indians.html*, Attachment No. 1 to the December 13, 2012 Request for Reconsideration Denied and *Tiller* pp. 931-940, Attachment Nos. 4-13 to the November 21, 2011 Office Action.

incorporates badlands which typically feature rock formations.[16] Lakota, therefore, refers to a Native American people living primarily on five federally recognized tribal sites, notwithstanding the decision of the United States government to call them Sioux and identify their federally recognized tribal entities using geographic indicators.[17]

According to the *Tiller's Guide* research publication, and the Internet passages and dictionary references submitted by the examining attorney, members of the Lakota tribe speak the Lakota language, which is a dialect of the Sioux tribal group.[18] Thus, the term LAKOTA "identifies" both the language and the people also known as the western Sioux.

(2)     Does LAKOTA identify a person or institution contemplated by § 2(a)?

Section 45 of the Trademark Act, 15 U.S.C. §1127, broadly defines the terms "person" and "juristic person." Accordingly, § 2(a) has been held to apply to commercial juristic persons, as well as natural persons.[19] *Notre Dame*, 703 F.2d at

---

[16] *Tiller's Guide* pp. 931, 934, 937, Attachment Nos. 4, 7, 10 to November 21, 2011 Office Action.

[17] The following are listed as federally recognized Indian Tribal Entities: Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota; Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota; Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota; Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota; and Standing Rock Sioux Tribe of North & South Dakota. See list of Recognized Indian Entities published in Federal Register Vol. 75 No. 190 pp. 60810-60814 and as supplemented at Vol. 75 No. 207 p. 66124, attached as Exhibit B to the May 21, 2012 Response to Office Action. The majority of the members of the seven Lakota subtribes are located on the foregoing five reservations. See note 15 *supra*.

[18]*See http://www.indians.org/articles/lakota-indians.html*, Attachment No. 1 to the December 13, 2012 Request for Reconsideration Denied.

[19] As the three grounds for refusal of registration under § 2(a) of the Trademark Act, i.e., matter which disparages, matter which falsely suggests a connection and matter which brings one into contempt or disrepute, all derive from the same subsection and all require a

10

1375, 217 USPQ at 508. The term "institutions" has also been broadly construed. *See In re Shinnecock Smoke Shop*, 571 F.3d 1171, 91 USPQ2d 1218, 1219 (Fed. Cir. 2009) ("[T]he ordinary meaning of 'institution' suggests the term is broad enough to include a self-governing Indian nation," quoting *Black's Law Dictionary* . . . defining "institution" as "[a]n established organization," and "organization" as a "body of persons ... formed for a common purpose"); *White I*, 73 USPQ2d at 1718, ("each federally recognized Apache tribe is necessarily either a juristic person or an institution"); *In re Urbano*, 51 USPQ2d 1776, 1779 (TTAB 1999) (entire organization comprising the Olympic Games, as a whole, qualifies as an "institution" within the meaning of § 2(a)); *In re North American Free Trade Association*, 43 USPQ2d 1282, 1285 (TTAB 1997) (NAFTA treaty is an institution in the same way the United Nations is an institution; legislative history of § 2(a) indicates the reference to "institution" therein "was designed to have an expansive scope"). *See also, Order Sons of Italy in America* v. *Memphis Mafia Inc.*, 52 USPQ2d 1364, 1369 (TTAB 1999) (where fraternal association brought cancellation alleging disparagement, Board considered whether involved mark was disparaging "either to members of the Order or Italian-Americans in general"); *In re In Over Our Heads Inc.*, 16 USPQ2d 1653, 1654 (TTAB 1990) (reversing refusal of registration of MOONIES and design on the ground that mark was disparaging of members of The Unification Church).

---

connection of the matter refused registration with "persons, institutions, beliefs or national symbols," we may look to prior cases involving any one of these refusals to determine the threshold question in this case, i.e., whether LAKOTA falsely suggests a connection with "persons" or "institutions." *White I*, 73 USPQ2d at 1717.

Finally, in another case involving various claims under § 2(a), and in the context of discussing the disparagement claim, the Board explained:

> Who comprises the targeted, or relevant, group must be determined on the basis of the facts in each case. For example, if the alleged disparagement is of a religious group or its iconography, the relevant group may be the members and clergy of that religion; if the alleged disparagement is of an academic institution, the relevant group may be the students, faculty, administration, and alumni; if the alleged disparagement is of a national symbol, the relevant group may be citizens of that country.

*Harjo* v. *Pro-Football Inc.*, 50 USPQ2d 1705, 1739 (TTAB 1999), *reversed* on other grounds, *Pro-Football Inc.* v. *Harjo*, 284 F.Supp.2d 96, 68 USPQ2d 1225 (D. D.C. 2003). Thus, persons and institutions as contemplated in § 2(a) may include groups of persons and individual members of a group such as the members of an Indian tribe having a common heritage and/or speaking a common language.

According to applicant, because LAKOTA is not identified on the federally recognized list of "Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs," LAKOTA does not identify a Native American tribe and, therefore, does not identify a person or institution within the meaning of § 2(a).[20] Applicant notes the Board's past reliance on inclusion on the government's list and points to the omission of the Lakota tribes on the list to support his position.[21]

---

[20] Applicant Appeal Brief p. 7.

[21] See list of Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs published in the Federal Register Vol. 75 No. 190 pp. 60810-60814 and as supplemented at Vol. 75 No. 207 p. 66124, attached as Exhibit B to the May 21, 2012 Response to Office Action.

Previously, the Board has deemed the listing of a name as a federally recognized Indian Entity as evidence that the name identifies a Native American person or institution.[22] *See White II*, 80 USPQ2d at 1658, (MOHAWK for cigarettes falsely suggests a connection with the federally recognized tribe the "St. Regis Band of Mohawk Indians of New York"); *White I*, 73 USPQ2d at 1718, (APACHE for cigarettes falsely suggests a connection with the nine federally recognized Apache tribes).

While inclusion on this list may satisfy the first and second prongs of the false connection test, the converse is not necessarily true. That is, omission from the list of federally recognized Indian Entities does not dictate that a name fails to identify persons or institutions. See *White II*, 80 USPQ2d at 1658, (Board not persuaded by argument that MOHAWK does not point uniquely and unmistakably to the Mohawk tribe because there is no federally recognized Mohawk tribe and the only federally recognized tribe is the St. Regis Band of Mohawk Indians of New York). Although in *White II*, the Mohawk name appeared as part of a name on the federally recognized list of Indian Entities and in this case Lakota does not so appear, we see no reason that this fact *per se* requires us to conclude that the name fails to identify a person(s) or institution(s). Numerous dictionaries, as well as the *Tiller's Guide* treatise relied on by the Board in prior cases, recognize LAKOTA as a particular group of Native American people. Additionally, a host of websites,

---

[22] We also note that a "federally recognized Indian tribe, organized under the laws of the United States, is an acceptable designation of an applicant's entity" in connection with procuring a U.S. trademark registration. See TMEP § 803.03(j) (April 2013).

including sites concerning the culture and news pertaining to Native Americans, and/or offering products for sale, utilize LAKOTA to identify and refer to the people from the Lakota Nation of Native Americans.[23] Thus, the fact that LAKOTA is not listed as a federally recognized Indian Entity cannot alone establish that LAKOTA fails to identify the Native American Lakota people. To the contrary, in view of the evidence, we find the term LAKOTA identifies a particular group of Native American persons or institutions despite the fact that the LAKOTA name is not listed as a federally recognized Indian Entity.[24]

The term LAKOTA need not be the legal name of the party falsely associated with applicant's mark to preclude registration by applicant. *See, e.g.*, *Hornby* v. *TJX Companies Inc.*, 87 USPQ2d 1411, (TTAB 2008) (respondent's "Twiggy" mark falsely suggested connection with petitioner who was given the nickname of "Twiggy" when a teenager, and was known by that name both personally and as a professional model); *Urbano*, 51 USPQ2d at 1780, (SYDNEY 2000 falsely suggested connection with Olympic Games to be held in Sydney, Australia); *In re Sauer*, 27 USPQ2d 1073, 1074 (TTAB 1993) ("Bo" widely recognized and used as Bo Jackson's nickname such that when "Bo Ball" and design mark is used on applicant's goods,

---

[23] See section A(3) *infra.*

[24] That the LAKOTA name identifies persons from more than one tribe does not negate the uniqueness of the name. Noting that the statute utilizes the plural for the terms "persons" and "institutions" and "clearly contemplates refusal of matter that would falsely suggest a connection with multiple persons, whether natural or juristic, or with multiple institutions," the Board determined that the nine federally recognized Apache tribes were persons or institutions for purposes of its § 2(a) analysis. *See White I,* 73 USPQ2d at 1717-1718. Similarly in this case, the Lakota tribes are related as they speak the Lakota language and share a common history.

purchasers are likely to make a connection between him and applicant's products); *Board of Trustees of the University of Alabama* v. *BAMA-Werke Curt Baumann*, 231 USPQ 408, 411 (TTAB 1986) (University, having demonstrated that BAMA was its well-known nickname, prevailed on its claim of false suggestion of a connection); *Buffett*, 226 USPQ at 430, (close association of term MARGARITAVILLE with public persona of opposer warranted denial of summary judgment against opposer).

Accordingly, we find LAKOTA identifies a historic people who speak the Lakota language and share a single Native American heritage. Therefore, LAKOTA identifies a "person(s)" or "institution(s)" as contemplated by § 2(a).

(3)   Applicant's argument that no entity exists with superior rights in the LAKOTA mark

Applicant additionally argues that the refusal is incorrect because the examining attorney failed to prove the existence of any entity having the authority to affirm or authorize the use of LAKOTA as a trademark.[25]  According to applicant, any passing mention of a tribal group in the examining attorney's evidence does not show that the group so referenced has authority to license, assign or otherwise transfer rights in the LAKOTA designation.[26]  Applicant's argument misses the mark. A false suggestion of a connection may be found when one's right to control the use of its identity is violated, even if the name claimed to be appropriated was never commercially exploited as a trademark or in a manner analogous to

---

[25] Applicant Appeal Brief pp. 15, 17.

[26] Applicant Appeal Brief p. 16.

trademark use. *Cf. Notre Dame*, 703 F.2d at 1375, 217 USPQ at 508-509; *Buffett*, 226 USPQ at 429.

Relying on the Board's decision in *In re MC MC S.r.l.*, 88 USPQ2d 1378 (TTAB 2008), applicant argues that the examining attorney's failure to prove the existence of a juristic entity or successor who is entitled to assert the right to use the designation means no party exists which could own a protectable interest in the LAKOTA name.[27] Applicant's reliance on the *MC MC* case is misplaced. The issue in *MC MC* was whether there were any successors entitled to assert rights under § 2(a) on behalf of Maria Callas, a famous opera singer who was deceased. Here, the group of persons who could assert rights in the LAKOTA name, unlike the deceased person in the *MC MC* case, constitutes living Native American Lakota people. Thus, they are endowed with proprietary rights under § 2(a) by virtue of their status as members of the Lakota tribe. *Compare with White II*, 80 USPQ2d at 1660-61 (application to register MOHAWK by single member of Mohawk tribe refused in absence of specific commercial connection for involved goods between tribe and applicant under the third factor).

That there is no evidence of any juristic entity having superior rights in the LAKOTA trademark is not relevant to our analysis. Rather, the lack of proof of such a juristic entity merely requires the examining attorney to provide some other proof that the term in question identifies a person(s) or institution(s). Even in the absence of a juristic entity with superior rights in the LAKOTA mark, Lakota is a

---

[27] Applicant Appeal Brief p. 18.

spoken language and identifies the group of people who speak that language. As such, the members of the Lakota-speaking group constitute "persons" contemplated in § 2(a) and as that term is defined in § 45 of the Trademark Act.[28]

In addition to identifying a language, the evidence shows that the LAKOTA name continues to be used both by the Lakota people to identify themselves and by others to refer to this Native American group and their culture.[29] In 1971, the Oglala Sioux Tribal Council chartered the Lakota Higher Education Center, a school which emphasizes retaining traditional Lakota values, linguistic skills and cultural heritage.[30] The Rosebud Sioux Tribe (*i.e.*, Sicangu Lakota Oyate tribe) opened a tourism office in 1994 to oversee development opportunities and the interpretation of Lakota culture for non-Indian visitors to tribal land.[31]

In 2009, after a tragedy resulting in the deaths of three people, it was reported that the Lakota Nation filed suit against "self-help guru" James Arthur Ray and the Angel Valley Retreat Center, alleging that Ray violated the peace between the government and the "Sovereign Lakota Nation" by impersonating an Indian and by abusing the cultural property of the Lakota people when he conducted a "sweat lodge" ceremony that lead to the deaths. The plaintiffs in the suit contended that under the customs, traditions and cultural values of the Lakota

---

[28] 15 U.S.C. § 1127 ("*Person, juristic person. . . .* includes a juristic person as well as a natural person.").

[29] That Lakota has survived as a spoken language is but one basis for reaching the conclusion that LAKOTA identifies a Native American group and their culture.

[30] *Tiller's Guide* p. 933, Attachment No. 6 to November 21, 2011 Office Action.

[31] *Tiller's Guide* p. 935, Attachment No. 8 to November 21, 2011 Office Action.

people, the sacred "sweat lodge" ceremony practiced by Ray is a way of life that was desecrated.[32]

In 2011, it was also reported that representatives of the Lakota tribes participated in a summit to protest the construction of the tar sands Keystone XL oil pipeline across lands secured to the "Lakota Nation."  Debra White Plume, identified as a Lakota activist, attended the summit, maintaining that the construction of the pipeline is a continuation of the destruction of her culture and her nation, and will "be genocide for our Oglala Lakota people."[33]

Letters posted on the website of applicant's licensee show that certain Native Americans continue to be identified under the LAKOTA name.  One such letter expresses gratitude to applicant's licensee for its "committed support of the Lakota people" while a second letter observes ". . . the elders and others in the community are in agreement that the loss of the [Lakota] language is both a symptom and a cause of the collapse of a strong, functional Lakota society."[34]  Prior email communications from June 2010 through July 2012 by the Lakota Language Consortium with applicant's licensee similarly express appreciation for "support of

---

[32] See *http://dontpaytopray.blogspot.com/2009/11/lakota-nation-calls-james-arthur-ray-on.html*; *http://nicdhana.blogspot.com/2009/11/lakota-nation-files-lawsuit-against.html*; *http://skywriter.wordpress.com/2009/11/18/lakota-nation-files-lawsuit-against-parties-in-sweat-lodge-incident/*, Attachment Nos. 51-53 to June 11, 2012 Final Office Action and Attachment Nos. 6-7, 18-19, 21-22 to December 13, 2012 Request for Reconsideration Denied.

[33] See *http://www.nativenewsnetwork.com/lakota-tribes-refuse-to-cooperate-with-tar-sands-proponents.html*, Attachment Nos. 23-28 to December 13, 2012 Request for Reconsideration Denied.

[34] See Exhibits A-C to Haukenfrers Declaration attached as Exhibit T to December 4, 2012 Request for Reconsideration.

the Lakota people" and advises that "Lakota Sioux make up the majority of the Consortium leadership."[35]   Additionally, the Life Initiatives website features a "Lakota History" link that contains a narrative on the history of the Lakota people, concluding with "[B]ut the Lakota people are here, still proud, still strong, still surviving, in the face of inestimable difficulties.  And the victory of a better life will come."[36]

Despite the fact that LAKOTA is not the name of a listed federally-recognized tribe, the evidence, including the public activities engaged in by members of the Lakota tribes, correspondence sent to applicant by Lakota language preservation organizations, and coverage of news events involving the Lakota people, shows the existence of persons who identify themselves and are identified by others as "Lakota," speak the Lakota language, and have engaged in activities on behalf of the tribe and in their individual capacity to protect the land and culture of the Native American Lakotas.  In view of this evidence, the term LAKOTA identifies "persons" or "institutions" as contemplated under § 2(a).  Therefore, applicant's proposed mark LAKOTA is identical to the name that identifies the Lakota people and language.

---

[35] See Exhibit D to Haukenfrers Declaration attached as Exhibit T to December 4, 2012 Request for Reconsideration.

[36] See *http://www.lifeinitiativesinc.org/lakota.html* printed June 11, 2012 and bearing "Copyright notice © 2010-2012 Life Initiatives (at P.O. Box 7505, Rapid City, SD)", Attachment Nos. 41-45 to June 11, 2012 Final Office Action.

B.     Does the term LAKOTA point uniquely and unmistakably to the person(s) or institution(s) known as the Native American Lakota tribes?

Applicant contends that LAKOTA does not point uniquely and unmistakably to the Native American Lakota people because various unassociated third parties use the name LAKOTA, there are numerous U.S. trademark registrations for marks containing the word LAKOTA, applicant himself owns several Canadian trademark registrations for the term and, his predecessor owned a now-cancelled U.S. registration for LAKOTA for nearly identical products.  A closer review of this evidence indicates it does not sufficiently rebut the persuasive evidence submitted by the examining attorney.

(1)     Third-party uses

According to applicant, LAKOTA is a commonly used term which does not point uniquely to Native American person(s) or institution(s) because numerous third parties that are not associated with any Native American tribe use LAKOTA as a trademark or trade name for a wide variety of goods and services.[37]  While the

---

[37] See Applicant Appeal Brief p. 8 and Exhibits D-S attached to May 21, 2012 Response to Office Action.  Two of these sixteen Exhibits have little probative value because the entities identified in the websites that are depicted in Exhibits O and P, Lakota Drilling (drilling and boring contractors in Leduc, Alberta) and Lakota Music ("we continue to drive Bristol's music scene forward") respectively, appear to be located outside of the United States and nothing on the websites indicates they are the type of sites or businesses that would attract viewers outside of the local areas.

Additionally, while Exhibits D-S appear to be printouts from the Internet, none of these Exhibits contain the pertinent URL or the date printed information.  For the reasons set forth in TBMP § 1208.03, in *ex parte* cases, it is preferable that material obtained from the Internet be identified by the full web address (i.e., the URL) for the web page, and the date it was accessed and printed.  Although the URL and date printed information were not provided for these Exhibits, the examining attorney did not request the information from applicant during examination or raise any objection, and generally referred to some of the Exhibits in her Appeal Brief.  Accordingly, we have considered these Exhibits.

20

record is silent as to whether any type of association exists between those third parties and the Native American Lakota people, the relatively few (i.e., fourteen) particular examples of third-party use are not sufficient to defeat the contrary evidence that there is a unique and unmistakable association of the name LAKOTA with the Lakota people. The examining attorney's evidence shows that some uses of the LAKOTA name directly relate to the Native American Lakota people. For example, as explained on the website of the city of Lakota, North Dakota, the city was named by governor N.H. Ordway for the "Lakotah [sic] Indian tribe."[38] Some business owners also chose the LAKOTA name because of its reference to the Indian tribe. The Lakota Coffee Company, a third-party user identified by applicant, explains on its website that its owner was inspired by the "Seven Sacred Campfires, known as the Western or Teton Sioux, Lakota – meaning 'friendly people.'"[39] Similarly, the owner of the Lakota Bakery chose the name Lakota because she was "born and raised in South Dakota and Dakota and Lakota are two of the tribes of Native Americans who live there."[40] Thus, some third-party users of the LAKOTA name chose the name specifically because of its direct reference to the Lakota Indian tribe. As noted by the examining attorney, the requirement that the proposed mark point uniquely and unmistakably to a particular institution or person does not mean that the term itself must be "unique," i.e., used exclusively to

---

[38] See *http://www.stores.lakotacoffee.com*, Attachment No. 16 to June 11, 2012 Final Office Action.

[39] See Attachment No. 17 from *http://www.stores.lakotacoffee.com/-strse-template/about/Page.bok* attached to June 11, 2012 Final Office Action.

[40] See Attachment No. 68 from *http://www.lakotabakery.com/bakery.html*, Attachment No. 68 to June 11, 2012 Final Office Action.

identify the institution or person.[41] Rather, the question is whether, as used on the goods in question, consumers would view the mark as pointing uniquely to the Lakota people. *Hornby*, 87 USPQ2d at 1426-27.

Although some third-party uses of LAKOTA directly reference the Lakota tribe, applicant contends U.S. consumers are so well-accustomed to the use of LAKOTA as a brand for many different products and services, and as the name for different places and institutions which do not emanate from Native American origins, that his LAKOTA mark does not point uniquely or unmistakably to a particular people or institution.[42] However, we lack information to determine whether the third-party uses identified by applicant are authorized by or affiliated with the Lakota people. Even assuming all of the third-party uses submitted by applicant have no connection with and do not point to the Lakota people, this is still not determinative. The concern in § 2(a) cases involving a false suggestion of a connection, unlike cases under § 2(d) which are concerned with protection of the public from confusion, is protection of persons and institutions from unauthorized exploitation of their personas. *Bridgestone/Firestone Research, Inc.* v. *Automobile Club De l'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1464 (Fed. Cir. 2001).[43] The concern in this case is protection of the identity of the Lakota people from use by another without the right to do so. Whether consumers are exposed or well-accustomed to *third-party* use of LAKOTA on a host of *other* products and

---

[41] Examining Attorney's Brief unnumbered p. 9.

[42] Applicant Appeal Brief p. 11.

[43] Nor are we concerned in this case with the question whether the Lakota people could, if they chose to try, establish a superior proprietary trademark right in the term LAKOTA.

services that are unrelated to applicant's goods is insufficient to show that *applicant's* LAKOTA mark when used on applicant's goods does not point uniquely to the Lakota people.

(2)    Third-party registrations and applications

Applicant also submitted evidence of five registrations for marks containing the word LAKOTA for the following goods and services, none of which is related to the goods covered in applicant's application: organizing intercultural events and exhibitions relating to American Indian culture, granite, tractors and travel trailers.[44]    However, third party registrations are not evidence that the marks depicted therein are in use or that the public is aware of them. *In re Opus One Inc.*, 60 USPQ2d 1812, 1814 (TTAB 2001) citing *Olde Tyme Foods Inc.* v. *Roundy's Inc.* 961 F.2d 200, 22 USPQ2d 1542 (Fed. Cir. 1992); *see also In re Helene Curtis Indus., Inc.*, 305 F.2d 492, 134 USPQ 501, 503-504 (CCPA 1962).

Thus, applicant has provided evidence of only four Registrations for LAKOTA marks that, on their face, have no connection with Native Americans (aside from

---

[44] See Exhibit T attached to applicant's May 21, 2012 Response to Office Action which includes evidence of the following Registrations:   3219393 for LAKOTA'S; 3345011 for LAKOTA TRACTORS; and 3536042 for LAKOTA CROSSINGS.  Applicant submitted two other registrations (Registration Nos. 2607457 for LAKOTA; and 3089672 for LAKOTA ROSE MADISON) which were cancelled or expired. Moreover, the services recited in Registration No. 3089672, include ". . . sponsoring, developing and carrying out programs to educate young people about the culture of the American Indian, and to educate young American Indians to the American culture."  See Exhibit T to applicant's May 21, 2012 Response to Office Action.  Hence, contrary to applicant's contention, the services in this Registration have a direct connection with Native Americans.   While the cancelled/expired registrations do not "provide constructive notice of anything," they are admissible and we have considered them for the modest quantum of probative value they may have as to this factor.   *Nike Inc. v. Maher*, 100 USPQ2d 1018, 1021 (TTAB 2011), *quoting, Action Temporary Services Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989).

23

the LAKOTA name).[45]   Applicant did not address the substantive differences between these four registrations and applicant's application, most notably, the differences in goods and services, to explain why these registrations show that his mark does not falsely suggest a connection with the Lakota people. *See Shinnecock*, 571 F.3d 1175, 91 USPQ2d at 1221.

Nor has applicant pointed to any case law holding that third-party applications and/or registrations should be accorded significant weight in an analysis of a § 2(a) false suggestion refusal and we see no reason to accord significant weight in this case, where we are unable to conclude that the public is aware of the marks shown therein. *See White II*, 80 USPQ2d at 1660.  Accordingly, applicant's evidence showing third-party uses and registrations for LAKOTA for goods and services that are unrelated to medicinal herbal remedies have little, if any, probative value. *See Hornby*, 87 USPQ2d at 1427 (consumers are likely to associate clothing and models, and therefore to view the mark TWIGGY as pointing to petitioner, a former model; three third-party registrations for unrelated goods or services have no probative value in showing name does not point uniquely to petitioner).  Finally, even if we presume that each of the third-party registrations should have been refused registration under § 2(a), such presumptive errors do not bind the USPTO and dictate that registration of applicant's mark now be granted

---

[45] We note that application Serial No. 85524250 for the mark SOUTH LAKOTA submitted by applicant after the mark was published for opposition, has since been abandoned. The Board has long held that third-party applications are evidence only of the fact that they were filed; they have no other probative value. *In re Juleigh Jeans Sportswear, Inc.,* 24 USPQ2d 1694 (TTAB 1992).

when such a grant, on the record before us, would be contrary to applicable law. *Shinnecock*, 571 F.3d at 1174, 91 USPQ2d at 1221.

(3)     Applicant's ownership of foreign registrations

Applicant's ownership of four Canadian trademark registrations for marks that include the LAKOTA name is not relevant to our consideration of the refusal under § 2(a) and, accordingly, we give them no consideration.  Registration in a foreign country does not ensure eligibility for registration in the United States as an applicant here is subject to the bars to registration mandated by U.S. law.  *In re Rath*, 402 F.3d 1207, 74 USPQ2d 1174, 1179 (Fed. Cir. 2005); *In re Mastic Inc.*, 829 F.2d 1114, 4 USPQ2d 1292, 1293 (Fed. Cir. 1987).  Moreover, we fail to see how a foreign registration bears on the question whether consumers in the U.S. would view the mark as falsely suggesting a connection with the Lakota people.  Therefore, applicant's ownership of Canadian registrations offers no support to overcome the refusal under § 2(a).

(4)     Prior U.S. registration of applicant's predecessor

Neither does the issuance of now-cancelled Registration No. 2308458 for LAKOTA for vitamin and herbal supplements owned by applicant's predecessor support the registrability of the current application.[46]  The Board is not bound by the prior decisions of examining attorneys in allowing the foregoing marks for registration.  It has been noted many times that each case must be decided on its own facts.  *See In re Nett Designs Inc.,* 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed.

---

[46] See Applicant Appeal Brief pp. 12-13 and Exhibit U to applicant's May 21, 2012 Response to Office Action.

25

Cir. 2001) ("Even if some prior registrations had some characteristics similar to [applicant's] application, the PTO's allowance of such prior registrations does not bind the Board or this court."); and *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1142 (Fed. Cir. 1987). In view of the foregoing, we are obligated to assess the registrability of applicant's mark on its own merits based on the record in this application and not simply based on the existence of other registrations. Thus, this cancelled registration is only evidence that the registration issued and does not afford applicant any legal presumptions under § 7(b) of the Trademark Act. *See Anderson, Clayton and Co.* v. *Krier*, 478 F.2d 1246, 178 USPQ 46, 47 (CCPA 1973) (statutory benefits of registration disappear when the registration is cancelled); *In re Brown-Forman Corp.*, 81 USPQ2d 1284, 1286 n.3 (TTAB 2006); *In re Phillips-Van Heusen Corp.*, 63 USPQ2d 1047, 1048 n.2 (TTAB 2002).

Moreover, in response to a refusal to register that LAKOTA mark based on a false suggestion of a connection under § 2(a), applicant's predecessor requested entry of the following amendment: "The goods are sold by Lakota Sioux Indians."[47] Because this amendment identified a direct connection between the Lakota people and the goods involved in that application, it significantly impacted the registrability of the LAKOTA mark.[48] Indeed, after the amendment was made, the application was approved for publication. Thus, the statement contained in the

---

[47] See May 7, 1999 Response to the Office Action of November 5, 1998, filed in connection with Registration No. 2308458, available on the USPTO's electronic TSDR database.

[48] The amendment also constitutes an admission by applicant's predecessor that a certain group of Native Americans is identified by the name "Lakota Sioux."

amendment is a material factual difference from applicant's present application. Applicant's argument that the issues in this case were already addressed and decided by the USPTO by virtue of the issuance of Registration No. 2308458 is disingenuous at best.

While the Board historically has not taken judicial notice of third-party registrations or USPTO records,[49] we find that taking judicial notice of the foregoing amendment made during the prosecution of Registration No. 2308458 is most appropriate in the unusual situation that arises in this *ex parte* case. Applicant has introduced Registration No. 2308458[50] and attempts to benefit from its issuance to his predecessor by arguing that the issuance of that Registration for the LAKOTA mark "implies that the issue raised herein, namely whether the mark may falsely suggest a connection with a Native American tribal group, was already addressed and decided by the [USPTO]."[51] By this argument, applicant essentially exploits the legal presumptions of the validity of the mark and registration under § 7(b) of the Trademark Act that are afforded to a registration to which it claims a direct

---

[49] See *e.g., In re Wada,* 48 USPQ2d 1689, 1689 n.2 (TTAB 1998) (request in reply brief that Board take judicial notice of "thousands of registered marks incorporating the term NEW YORK for products and services that do not originate in New York state or city" denied), *aff'd,* 194 F.3d 1297, 52 USPQ2d 1539 (Fed. Cir. 1999); *In re Thomas Nelson Inc.,* 97 USPQ2d 1712, 1717 n.18 (TTAB 2011); *Beech Aircraft Corp. v. Lightning Aircraft Co.,* 1 USPQ2d 1290, 1293 (TTAB 1986) ("[W] e do not take judicial notice of application and registration files that reside in the Patent and Trademark Office on the basis of their mere identification in briefs, pleadings and evidentiary submissions."). Also see, TBMP §§ 704.12 and 1208.04.

[50] Registration No. 2308458 is in the record. See Exhibit U to applicant's May 21, 2012 Response to Office Action which consists of a copy of a Trademark Electronic Search System (TESS) report for the Registration.

[51] See Applicant Appeal Brief pp. 12-13.

27

relationship. Under these circumstances, where applicant has relied on the validity of a registration for the same mark and (essentially the same) goods at issue in this appeal and to which applicant claims a direct relationship, taking judicial notice of a material basis for the issuance of that registration as set forth in an amendment filed during the prosecution of the registration, for the purpose of assessing applicant's argument, is both appropriate and in accordance with 37 C.F.R. § 2.122(a) and TBMP §§ 704.12(a) and 1208.04.[52] Accordingly, the issuance of Registration No. 2308458 for the LAKOTA mark to applicant's predecessor does not support applicant's position. To the contrary, issuance of the Registration based on the representation of a direct connection between the Lakota people and the goods involved in that application, supports the refusal of registration of applicant's mark in this case where there is no evidence of a connection between applicant's goods and the Lakota people.

In view of the foregoing, applicant's third-party evidence fails to show that LAKOTA does not point uniquely and unmistakably to persons or institutions known as the Lakota.

C.    Whether the Lakota people are connected with the sale of applicant's goods

Applicant's primary contention is that because there is no juristic entity with the ability to authorize the transfer of rights in the LAKOTA designation for use with medicinal herbal remedies and preparations, there can be no connection between him and the Lakota people. As addressed above, an active group of

---

[52] See also Fed. R. Evid. 801(d) (prior statements and admissions).

28

persons identified by the name LAKOTA exists such that the lack of proof of a juristic entity authorized to transfer rights to the use of LAKOTA does not call for the conclusion that no connection with the Lakota people is possible.[53]  Therefore, we consider applicant's alternative argument, i.e., that a connection exists between him and "an entity that can be considered associated with an Indian group that speaks the Lakota language."[54]  To say the least, such connection is tenuous. Nonetheless, we consider whether applicant's evidence shows the type of connection contemplated by § 2(a) between applicant and the Lakota tribes.

In support of his position that he has a connection with Native American organizations that are interested in preserving the Lakota language, applicant submits the Declaration of Reinhardt Haukenfrers.[55]  Mr. Haukenfrers is the Vice President of HPI Health Products, Inc. of Canada.  HPI uses the LAKOTA name on the goods identified in applicant's application through a license from applicant, Kent Pedersen, who also serves as the President of HPI.  (Haukenfrers Decl. ¶¶ 2, 3).[56]  HPI owns and operates the *www.lakotaherbs.com* website and has sold health related products under the LAKOTA mark in Canada since at least as early as March 2000 and began selling such products in the United States in 2010.

---

[53] Moreover, it is not entirely clear that no such entity exists.  That ownership question, however, is not before us.

[54] See Applicant Appeal Brief pp. 18-21.

[55] See Exhibit T to the December 4, 2012 Request for Reconsideration after Final Action. Inadvertently, two exhibits have been designated as Exhibit T (this Exhibit T is different from the Exhibit T applicant submitted with its May 21, 2012 Response to Office Action).

[56] The only evidence of the license between HPI and applicant is the statement in Mr. Haukenfrers' Declaration.

(Haukenfrers Decl. ¶¶ 6, 9). According to Mr. Haukenfrers, HPI has partnered with "at least two organizations that are in some way associated with the Native American Indian Community and in particular, the people that speak the Lakota language such as the Sioux Indians." (Haukenfrers Decl. ¶ 10). Specifically, HPI has been an official sponsor of the Lakota Language Consortium, a non-profit organization formed with the intention of educating children from Native American Indian tribes to learn and preserve the Lakota language (Haukenfrers Decl. ¶¶ 11-12); as well as the Lakota Immersion Childcare program located on the Pine Ridge Reservation in South Dakota which works to assist young children to learn and become fluent speakers of the Lakota language. (Haukenfrers Decl. ¶ 13). Applicant argues that its financial contributions to these two organizations is proof of a definitive commercial association between organizations involving members of Native American Indian tribes that are interested in preserving the Lakota language and applicant's use of the LAKOTA mark.[57]

The foregoing connection between applicant's licensee and the language preservation organizations falls far short of the type of commercial connections that are sufficient to overcome a § 2(a) refusal. *See In re Los Angeles Police Revolver and Athletic Club Inc.*, 69 USPQ2d 1630, 1633-34 (TTAB 2003) ("actual commercial connection" existed between applicant and the Los Angeles Police Department where the Department "openly advanced the commercial activities of applicant" including allowing applicant to train LAPD officers, and the Department's use and

---

[57] Applicant Appeal Brief p. 21.

maintenance of applicant's real estate); *In re Sloppy Joe's Int'l Inc.,* 43 USPQ2d 1350, 1353-54 (TTAB 1997) (Hemingway's friendship with original owner of applicant, his frequenting the bar and use of the back room as an office did not establish the kind of "commercial connection" that entitled applicant to register a mark consisting in part of a portrait of Hemingway). *Compare with White II*, 80 USPQ2d at 1660 (although applicant is a member of a Mohawk tribe, a general commercial connection between applicant and the institution held insufficient; the commercial connection must be specific and relate to the particular goods and services). In short, the philanthropic good will engendered by applicant's licensee with the Lakota language preservation organizations as a result of its donations to the organizations does not equate to evidence of a commercial connection between applicant and the Lakota people.

The fact that there is more than one tribal group that can be identified as LAKOTA does not excuse Applicant from the need to demonstrate a commercial connection with the Lakota people. The Lakota tribes are encompassed by a single historic group. That individuals may be members of certain tribes within this historic group should not obfuscate the fact that they share the same unified heritage. *See White I*, 73 USPQ2d at 1720 (existence of nine Apache tribes did not absolve applicant from having to establish a connection with the Apache tribes in order to use the tribal name on its goods). Therefore, whether the persons residing on the five reservations home to the Lakota people are considered individually or collectively, if applicant's use of LAKOTA is viewed as falsely suggesting a

31

connection with these persons or institutions, the refusal of registration under § 2(a) is warranted. *Id.*

The charitable donations to the Lakota language preservation organizations made by applicant's licensee do not evidence that either organization authorized the use of the LAKOTA name by applicant or his licensee; nor is there evidence that either of these organizations has the legal capacity to do so. Moreover, even if the donations made by applicant's licensee did constitute a commercial connection, there is no evidence establishing any type of connection between the language preservation organizations and the Lakota tribes. Therefore, applicant has not shown a commercial connection between himself and those organizations, much less the necessary connection with the Lakota people.

D.  Is the fame or reputation of the Lakota people such that when the mark is used with applicant's goods, a connection with them would be presumed?

If the fame or reputation of the Native American people known as the Lakota is of such nature that a connection with them would be presumed when applicant's mark is used on his goods, then it may be inferred that purchasers of the goods would be misled into making a false connection of sponsorship, approval, support or the like with the Lakota people. *Cotter*, 228 USPQ at 205; *In re National Intelligence Academy*, 190 USPQ 570, 572 (TTAB 1976). Applicant contends that only a relatively small percentage of Native Americans may be associated with the word LAKOTA as the name of a language and this does not lend itself to a level of

fame or reputation such that a connection with that group of Native Americans would be presumed.[58]

The evidence indicates there are about 70,000 registered Lakota Indians and that there are thousands who also speak the Lakota language.[59]  Under the four factor test, we must look to the fame or reputation of these Lakota people in order to determine whether a connection with applicant's goods would be presumed.  *See Gavel Club* v. *Toastmasters International,* 127 USPQ 88, 94 (TTAB 1960) ("[T]here is nothing in Section 2(a) of the Act which would indicate that it is intended to afford protection only to large or nationally known institutions.").

According to the undisputed evidence submitted by the examining attorney, the Lakota people, which are primarily located in the Dakotas, are not only extensively involved in the development of the communities in which they reside, they are also involved in educating the public about their culture and in marketing products and services to the general public, including an ever-increasing tourism industry.[60]

The Oglala Lakota of the Pine Ridge Reservation operate the Prairie Winds Casino with over 170 employees, most of whom are tribal members.  The tribe operates the largest Indian-owned and operated public radio station in America,

---

[58] Applicant Appeal Brief p. 13.

[59] See *http://www.indians.org/articles/lakota-indians.html*, Attachment No. 1 to December 13, 2012 Request for Reconsideration Denied.  According to the website, *Indians.org* is part of the American Indian Heritage Foundation, a non-profit charity "dedicated to the preservation and accurate presentation of the rich culture of the American Indian."

[60] See *Tiller's Guide* p. 931, Attachment No. 4 to November 21, 2011 Office Action.

broadcasting in both English and Lakota. Tourist attractions on the Pine Ridge Reservation of great public interest include the Wounded Knee Battlefield and the Badlands National Park, which the tribe co-manages with the National Park Service. The tribe's parks and recreation department offers guided hunts for large and small game.[61] The tribe also operates the Heritage Center, a museum and cultural resource center, on the campus of the Red Cloud Indian School. The Lakota Trade Center operated by the Lakota Fund, a nonprofit community development financial institution, houses local arts and crafts for sale. Each August, the tribe holds the Sun Dance and Oglala Nation Powwow attracting thousands of tourists, and the Lakota Vietnam Powwow is held yearly as well. Oglala Lakota College is a tribally chartered fully-accredited university that was responsible for the formation of the Lakota Fund for community development.[62]

The Lakota on the Rosebud Reservation operate the Rosebud Casino and Quality Inn. They also operate a tourism office to oversee the development of tourism and the interpretation of Lakota culture for non-Indian visitors. The tribe began renewable energy efforts with the development of a wind turbine, maintains golf courses and has a variety of businesses including restaurants and auto repair shops. It also has shops featuring fine arts and Lakota crafts offered for sale to the public.[63]

---

[61] See *Tiller's Guide* p. 932, Attachment No. 5 to November 21, 2011 Office Action.

[62] See *Tiller's Guide* p. 933, Attachment No. 6 to November 21, 2011 Office Action.

[63] See *Tiller's Guide* pp. 934-35, Attachment Nos. 7-8 to November 21, 2011 Office Action.

The Lakota on the Standing Rock Reservation are also involved in numerous business activities. The tribe operates two casinos. Lakota Technologies, a million dollar enterprise, provides telephone service and Lakota Energy, owned by a tribal member, supplies fuel oil and propane to homes in the districts of the reservation.[64] A variety of tribal celebrations, including powwows, are open to the public. The tribe annually marks the death of the Lakota Chief Big Foot at Wounded Knee. Other public attractions include the grave of Lakota Indian Chief Sitting Bull. The tribe has also attracted industrial manufacturers to the reservation and leases property to non-Indian farmers and ranchers.[65]

In view of the foregoing, we find that the Lakota people are of sufficient renown for their business, tourism and cultural enterprises such that they would be well known not only among residents of the Dakotas, but also to visitors to that area. *See White I*, 73 USPQ2d at 1721. Additionally, as shown below, the reputation of Lakota people extends to healing and traditional medicinal herbal remedies.

Traditionally, Lakota tribal members were herbal healers.[66] The Lakota "still practice their sacred and traditional ceremonies which encompass the seven sacred rites" of the Lakota. The majority of people follow the traditional Native

---

[64] See *Tiller's Guide* p. 939, Attachment No. 12 to November 21, 2011 Office Action.

[65] See *Tiller's Guide* pp. 938-39, Attachment Nos. 11-12 to November 21, 2011 Office Action.

[66] See *Tiller's Guide* p. 934 Attachment No. 7 to November 21, 2011 Office Action; and *http://www.squidoo.com/Basic-Herbal-Remedies-1*, Attachment No. 33 and *http://www.native-net.org*, Attachment Nos. 32-33 to June 11, 2012 Final Office Action.

American religion under the leadership of medicine men.[67]  In 2012, the section of the "Native Net" website entitled "Lakota Indians" observed that "[T]he Lakota Indians and many other Indian tribes always have and still do practice 'natural medicine.'"[68]  Today, certain individuals identify themselves as Lakota herbal practitioners.  Moreover, herbalists travel to the Pine Ridge Lakota Indian Reservation to learn Lakota ways and traditional Lakota herbal use.[69]  Finally, classes are offered in "Lakota medicine teachings."[70]

The National Law Institute Community Center of Healing established on the Standing Rock Reservation populated by Lakota tribal members harvests herbs which it utilizes to make Lakota herbal remedies and personal care products that are advertised at its website and offered for sale.  These remedies include "Lakota Pejuta Islaye," an herbal salve for skin problems and sore joints and "Lakota Ipawaga Si Cayata," a peppermint foot scrub.  The Institute invites people from all

---

[67] See *Tiller's Guide* pp. 931 and 934, Attachment Nos. 4 and 7 to November 21, 2011 Office Action.

[68] See *http://www.native-net.org/tribes/lakota-indians.html*, Attachment Nos. 15-16 to December 13, 2012 Request for Reconsideration Denied.

[69] See *http://www.livestrong.com*, Attachment Nos. 19-20 to June 11, 2012 Final Office Action; and *http://www.nhaa.org.au/index.php?option=com_content&view=article&id=447&Itemid=322*, Attachment Nos. 34-35 to June 11, 2012 Final Office Action (practicing herbalist Rob Santich of Avalon, Sydney Australia, "travels to the Pine Ridge Lakota Indian Reservation in South Dakota USA to learn Lakota ways, take part in ceremonies and learn traditional Lakota herb use.").

[70] "Lakota Medicine Teachings" were the subject of a seminar by Niccole Toral, an earth-based curandera (healer), scheduled for September 8, 2012, and the complete teachings were advertised in connection with a Medicine Walk Retreat scheduled for November 9-11, 2012 in Highland, North Carolina.  According to an online promotion of the courses, Niccole Toral's earth-based traditions include "Vision Quest, a Wilderness Rites of Passage, the Andean cosmology of the Q'eros, and the Native American ceremonies of the Lakota."  See *http://www.crystalvisionbooks.com/?p=6106*, Attachment Nos. 8-9 to December 13, 2012 Request for Reconsideration Denied.

areas of the world to visit the Institute on a work-trade basis.[71] On the "aworldofgoodhealth.com" website, "Lakota Native Herbals" are listed as a product category along with "Chinese Medicines," "Ayurvedic Herbals" and "Bath & Body."[72]

A permaculture[73] design course offering participation in the creation and maintenance of a Lakota herbal medicine wheel garden is offered on the Pine Ridge Reservation. This course incorporates projects offered in connection with the Oglala Lakota Cultural and Economic Revitalization Initiative which features a Lakota-owned and run ranch with an 8000 acre demonstration site.[74]

Although the evidence shows that Native American tribal groups, including Lakota tribal members, are recognized for healing and the use of healing remedies, this evidence, according to applicant, does not show that a subgroup of Native American Sioux who speak Lakota have either a level fame or have produced and sold applicant's goods. Thus, applicant argues, the record does not establish that

---

[71] See *http://www.naturallawinstitute.com* and *http://www.thenaturallasinstitute.com/massage-and-bodyworks.php*, Attachment Nos. 18-22 to November 21, 2011 Office Action.

[72] See *http://www.aworldofgoodhealth.com/native-american-medicine.htm*, Attachment No. 26 to June 11, 2012 Final Office Action.

[73] *Permaculture* is defined as: an agricultural system or method that seeks to integrate human activity with natural surroundings so as to create highly efficient self-sustaining ecosystems; from *http://www.merriam-webster.com/dictionary/permaculture*. The Board may take judicial notice of dictionary definitions, *Notre Dame*, 213 USPQ at 596, including online dictionaries that exist in printed format or have regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1378 (TTAB 2006).

[74] See Permaculture Blog at: *http://www.permaculturelist.wordpress.com/2011/04/01/permaculture-pine-ridge-alkota-reservation-permaculture-design-course-in-june*, Attachment Nos. 23-25 to June 11, 2012 Final Office Action.

LAKOTA falsely suggests a connection with Indian tribal groups in the business of selling herbal remedies.[75]

Applicant misconstrues the nature of our inquiry under section 2(a)'s false suggestion of a connection provision. Contrary to applicant's contention, we do not require proof that the Lakota Indian tribe or its members are famous for selling herbal remedies or even that the tribe or its members sell herbal remedies. Rather, we inquire into whether the fame or reputation of the Lakota people is such that when the LAKOTA mark is used with applicant's goods, consumers would recognize LAKOTA as used in the mark to refer to the Lakota people such that a connection with the Lakota people would be presumed.

As noted in *Notre Dame*, and further explained in *White I*, the fame of the name of a person or institution is not sufficient in and of itself to provide the basis for protection of the name under the § 2(a) false suggestion analysis. *Notre Dame*, 217 USPQ at 509. Rather, the key is whether the name *per se* is unmistakably associated with a particular person or institution and, *as used* would point uniquely to the person or institution. In short, it is the combination of: (1) a name of sufficient fame or reputation and (2) its use on or in connection with particular goods or services, that would point uniquely to a particular person or institution. *White I*, 73 USPQ2d at 1720. Thus, our inquiry is whether consumers of medicinal herbal remedies would think only of the Lakota tribes when the LAKOTA name is used on such goods. *Cf. Notre Dame*, 217 USPQ 509 ("'Notre Dame' is not a name

---

[75] See Applicant Appeal Brief p. 14.

solely associated with the University. It serves to identify a famous and sacred religious figure and is used in the names of churches dedicated to Notre Dame, such as the Cathedral of Notre Dame in Paris.").

Here, there is no question that the USPTO has proven both points, and that there is the false suggestion of a connection. The evidence amply demonstrates the fame of the Native American people known as the Lakota. Additionally, the evidence establishes that their reputation with respect to healing and herbal remedies is of such nature that a connection with them would be presumed by consumers when applicant's LAKOTA mark is used on his goods. *See Hornby*, 87 USPQ2d at 1427 n.19 ("We point to petitioner's fame as a model not to show that consumers would expect her to be associated with the sale of clothing, but because consumers are likely to associate clothing and models, and therefore to view the mark TWIGGY as pointing to petitioner."). We hasten to note that this fourth factor does not require proof of a reputation that is closely related to an applicant's goods. However, there is strong evidence of this type of relationship in this case.

In view of the foregoing, there is sufficient evidence for us to conclude that consumers will view applicant's mark LAKOTA as used on his identified goods as referring to the Lakota people. While analysis of this factor of the test for false suggestion of a connection does not require an inquiry into the intent of the applicant to identify with the named person or institution, applicant argues that LAKOTA is not used to create any type of false association (although he admits that the term LAKOTA when associated with his products "may suggest that the

formulary respects the Native American tradition").[76]   Because any evidence of applicant's intent to identify with the Lakota people is highly persuasive that the public will make the intended false connection, *Notre Dame*, 217 USPQ at 509, we consider the evidence relating to applicant's intent.

The evidence shows applicant's intention to identify with Native Americans in general, and the Lakota people in particular, as demonstrated by his licensee's website which features of variety of images and language urging the connection.[77] For example, the masthead at the top of each webpage prominently features a photograph of a Native American next to the name "LaKOTA™" with the slogan "Legendary Native American Formulas" directly underneath.  Indeed, it is difficult to imagine any other purpose for using the image of a Native American together with the word "Legendary" in such a prominent manner except to draw the connection between the Native American Lakota people and their "legendary" history and reputation for traditional natural remedies:



---

[76] Applicant Appeal Brief p. 12.

[77] See *http://lakotaherbs.com/Home.aspx*, Attachment Nos. 14-17 to November 21, 2011 Office Action and *http://www.lakotadirect.com*, Attachment Nos. 4-5 to December 13, 2012 Request for Reconsideration Denied.

Products displayed on the website also bear labels that prominently feature the same Native American image:



A text box directly underneath the masthead on the Home Page contains the following language reinforcing the tie between Native Americans and traditional medicines:

Lakota products are rooted in traditional Native American medicine and natural ingredients. Lakota is medicine that works to relieve pain. Try Lakota and write your own story about pain relief.

In several other places, the website reinforces this tie by noting that Lakota brand products are "Traditional Medicine with Natural Ingredients" and "rooted in traditional Native American medicine":

**Traditional Medicine With Natural Ingredients**

The powerful formulas used in Lakota products are rooted in traditional Native American medicine and represent the collective tradition and knowledge of many different Indian Nations . . .

The images of Native Americans on the website and product packaging, and the multiple references to the "traditional Native American" formulas used in the products, invite purchasers to make a connection between applicant's products and

the Native American Lakota people.  Thus, applicant, despite his protests to the contrary, consciously or otherwise is forging a false connection between his products and Native Americans, and specifically members of the Lakota Nation.[78]

The section of applicant's licensee's website entitled "Lakota Supports the Lakota Language" indicates there are fewer than 6,000 Lakota speakers and advocates that the Lakota language "needs to be preserved."  This statement urging the preservation of the Lakota language in connection with products sold under the LAKOTA brand clearly draws a connection between the people who speak the Lakota language and the LAKOTA products sold by applicant's licensee.  Similarly, the letters from the two Lakota language preservation organizations supported by applicant's licensee that are posted on its website promotes a strong connection with the Lakota people.[79]

In view of the foregoing, applicant, via its licensee, has intentionally or otherwise, drawn a false association between his goods and members of the Lakota tribes.

---

[78] We note that LaKOTA brand medicinal herbal products were previously marketed as "LaKOTA Native American Herbal Formulas" and included the following statement at the bottom of a webpage on which they were marketed: A portion of all proceeds from the sale of LaKOTA products go to benefit the Oglala, Hunkpapa, Sans Arc, Minneconjou and Brule *Lakota* (Sioux) Tribes.  © Copyright 1999 Farmanatural, Inc.  (emphasis added).  See *http://wa007.com/projects/lakota/*, Attachment No. 31 to June 11, 2011 Final Office Action.  The connection being drawn between such products and the Lakota tribe is clear.  While applicant has indicated that the foregoing website is not its website, Mr. Haukenfrers stated that HPI's predecessor was selling products under the Lakota mark in 1998 which is consistent with the foregoing copyright date.  See Haukenfrers Declaration, ¶ 6 of Exhibit T to December 4, 2012 Request for Reconsideration.

[79] See Exhibits A-D to Haukenfrers Declaration attached as Exhibit T to December 4, 2012 Request for Reconsideration.

**Conclusion**:

Because: (1) applicant's proposed mark LAKOTA is identical to the name currently and previously used to identify existing Native American people and their language; (2) the LAKOTA name points uniquely and unmistakably to the Lakota people and language; (3) applicant has no actual or commercial connection with the Lakota people or language; and (4) the LAKOTA name is of sufficient fame or reputation that a connection with the Lakota people would be presumed if applicant's mark were used in connection with his goods, we find that applicant's mark for his identified goods falsely suggests a connection with the Lakota people.

**Decision**: The refusal to register LAKOTA under § 2(a) of the Trademark Act is affirmed.